E-FILED
Sunday, 31 March, 2019  03:37:44 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| FELITA MCGEE, as Independent Administrator of the Estate of MICHAEL CARTER, SR., *deceased* and as next-of-kin | ) ) ) ) | |
| Plaintiff | ) ) | |
| vs. | ) ) ) | Case No. 16-cv-02221 |
| MACON COUNTY SHERIFF'S DEPARTMENT; DECATUR MEMORIAL HOSPITAL; DMH CORPORATE HEALTH SERVICES; ROBERT BRACO, MD; JO BATES, LPN; RANDELL WEST; LARRY PARSANO; TERRY COLLINS; MICHAEL PATTON; and JOSHUA PAGE | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 37 AGAINST DEFENDANT DECATUR MEMORIAL HOSPITAL AND DEFEDANT ROBERT BRACO

Plaintiff, FELITA MCGEE, as Independent Administrator of the ESTATE OF MICHAEL CARTER, SR. *deceased*, by her attorneys, LAW OFFICES OF RAHSAAN A. GORDON, and pursuant to Fed. R. Civ. P. 37, hereby motions the Court to enter an order sanctioning Defendant DECATUR MEMORIAL HOSPITAL ("DMH") and Defendant ROBERT BRACO ("Braco"), and in support states as follows:

### BACKGROUND

1.     Plaintiff brings this cause of action against various defendants for various claims including wrongful death, survival, constitutional violations, state law medical malpractice, and battery.

2.      Plaintiff alleges Michael Carter, Sr.'s death occurred on or about July 18, 2015, while in the care of Defendant Decatur Memorial Hospital's (DMH) employees, Defendant Dr. Robert Braco and Defendant Nurse Jo Bates, and pursuant to its health services contract with Defendant Macon County Sheriff's Department ("Sheriff").

3.      Mr. Carter, Sr. was booked into Macon County's jail on July 13, 2015, and self-reported as a Type 2 diabetic.  Five days later he died from diabetic ketoacidosis after being under the medical care of Defendants. (*See* Plaintiff's Amended Complaint – Attached hereto as Exhibit A)

4.      On January 5, 2018, Plaintiff forwarded Defendant DMH written discovery requests, consisting of interrogatories and a request to produce certain documents (*See* Plaintiff's Interrogatories – Attached hereto as Exhibit B; *See* Plaintiff's Request to Produce – Attached hereto as Exhibit C; and *See* Plaintiff's counsel's email to Defendant DMH's counsel – Attached hereto as Exhibit D)

5.       In relevant part, Plaintiff requested the following:

**PLAINTIFF'S INTERROGATORIES TO DMH AND BRACO (1/5/18)**

2.   Do you know of any statements made by any person relating to the care and treatment of the decedent or the damages alleged of in the complaint?  If so, give the name and address of each such witness and the date of the statement, and state whether such statement was written or oral and if written the present location of each such statement.

13.  Have you (or has anyone acting on your behalf) had any conversations with any person at any time with regard to the manner in which the care and treatment alleged in the complaint was provided, or have you

overheard any statement made by any persons at any time with regard to the injuries complained of by the plaintiff or the manner in which the care and treatment alleged in the complaint was provided?  If so, state: a. The date or dates of such conversation(s) and/or statements(s); b. The place of such conversation(s) and/or statement(s); c. All persons present for the conversation(s) and/or statement(s); d. The matters and things stated by the person in the conversation(s) and/or statement(s); e. Whether the conversation(s) was oral, written and/or recorded; and f. Who has possession of the statement(s) if written and/or recorded.

19.  Identify any statements, information and/or documents known to you and requested by any of the foregoing interrogatories which you claim to be work product or subject to any common law or statutory privilege, and with respect to each interrogatory, specify the legal basis for the claim.

20.  List the name and address of all persons (other than yourself and persons heretofore listed) who have knowledge of the facts of the care and treatment complained of in the complaint filed herein and/or of the injuries claimed to have resulted therefrom.

**PLAINTIFF'S PROD. REQUESTS TO DMH AND BRACO (1/5/18)**

1.  Any and all documents, notes, reports, summaries, photographs, audio recordings, video recordings, and any other tangible item(s) relating to the circumstances surrounding Michael Carter Sr.'s death.

3.  Any and all documents, notes, reports, summaries, photographs, audio recordings, video recordings, and any other tangible item(s) relating to any investigation into the death of Michael Carter. Sr.

6.  On February 5, 2018, Defendant DMH swore, via its Vice-President of Legal Affairs and Corporate Compliance, Katherine Anderson, that she **had "read the foregoing responses to Plaintiff's Interrogatories, and the answers made herein were true, correct and complete to the best of her knowledge and belief."** (*emphasis added*) (*See* Defendant DMH's Response to Plaintiff's Interrogatories – Attached hereto as Exhibit  E)

7.  At the time of Mr. Carter, Sr.'s death in July 2015, Ms. Anderson also represented both Defendants Braco and Bates at various interviews with Illinois State Police investigating the circumstances surrounding Mr. Carter, Sr.'s death, as a partner at the same law firm currently representing Defendants DMH and Braco.

8.  By the time Plaintiff filed her lawsuit, Ms. Anderson had left the law firm to become Vice-President of Legal Affairs and Corporate Compliance for Defendant DMH.   The same law firm also represented Defendant Bates in the herein action, before Defendant Bates retained new counsel due to an obvious conflict between her two co-Defendants, DMH and Braco.

9.  In Defendant DMH's responses to Plaintiff's interrogatory # 2, it swore it was only aware of an Illinois State Police investigation, and "unaware of any statements independent of that report."  (Exh. E)

10.  In Defendant DMH's response to interrogatory #13, it swore it (or anyone on its behalf) was unaware of any non-privileged conversations and/or statements made by anyone, or overheard any relating to "the manner in which the care and treatment" of Michael Carter. (*Id.*)

4

11.     In Defendant DMH's response to interrogatory #20, it again swears, under oath, denial of knowledge of any non-privileged information regarding the "name, address of all person who have knowledge of the facts of the care and treatment complained of in the complaint…" (*Id*.)

12.     In Defendant DMH's response to Plaintiff's Request to Produce, there are more **complete denials regarding knowledge of existing statements "documents, notes reports," etc**. relating to this incident other than those contained within the Illinois State Police. (*See* Defendant DMH's Response to Plaintiff's Request to Produce – Attached hereto as Exhibit F)

13.     On April 10, 2018, Plaintiff took the discovery deposition of John Ridley, an executive vice-president at Defendant DMH.   He's the only non-party witness voluntarily produced by Defendant DMH during the entirety of discovery.

14.     Mr. Ridley signed the health services agreement contract in effect at the time of Mr. Carter, Sr.'s death. (*See* John Ridley Deposition at 36 – Attached hereto as Exhibit G)  He testified, "At that time the corporate health department at the hospital reported to me, so it would have been natural for me to be the executive to sign the agreement."  (*Id*.)

16.     Debbie Acciavatti was Administrative Director of Defendant's DMH's Corporate Health Division, and worked at DMH for more than 35 years.  (*Id*. at 41, and 49 – 52)  She managed the day-today operations of the jail. (*Id*. at 49-52)

17.     Mr. Ridley testified he learned about Mr. Carter, Sr.'s death from Debbie Acciavatti shortly after the incident.  (*Id*. at 105 – 106)

18.     Mr. Ridley swore, under oath, he was unaware Jo Bates was no longer employed by Defendant DMH. (*Id*. at 99)

Q:     Are you aware that Jo Bates is no longer employed by DMH?

A:     No, I'm not.

19.     Ridley further testified that Ms. Acciavatti provided him no details regarding the incident, other than "we had the death at the jail."  And "no details." (*Id.* 105 - 108)

20.     After the parties were unable to reach settlement a Court-hosted settlement conference, Plaintiff subpoenaed Ms. Acciavatti for deposition, a now former DMH employee, terminated a year after the incident.  (*See* Debbie Acciavatti Deposition at p. 36 – Attached hereto as Exhibit H)

21.     Ms. Acciavatti testified that later the same day of Mr. Carter, Sr.'s death, the jail's administrator called and told her that Defendant Bates wasn't allowed back at the jail because she lacked empathy relative to Michael Carter's medical distress.  (*Id.* at 85-69)

22.     The very first person she spoke to was Tim Stone, her boss at the time, and current President of Defendant DMH.  (*Id.* at 88)

23.     Ms. Acciavatti testified that she told Mr. Stone of the in-custody death and it "was communicated to [her] that the nurse perhaps didn't do everything that was required of her position."  (*Id.* at 89)

24.     Ms. Acciavatti testified she reported this information to Mr. Stone in her role as administrator of Corporate Health Services, and such reporting was normally done in the regular course of business.  (*Id.* at 91)

25.     After speaking to Mr. Stone, Ms. Acciavatti spoke to Defendant Bates on the phone later that evening.  (*Id.* at 91)  Defendant Bates told Ms. Acciavatti that Defendant Braco had refused to authorize her to call an ambulance for the decedent because he wanted to avoid incurring a $1000 bill for the ambulance.  (*Id.* at 92-96)  This wasn't the first time Defendant

6

Braco had taken money into consideration as it related to health care decision-making while working at the jail.  (*Id*. at 96)

26.     After learning Defendant Braco refused to authorize calling an ambulance in order to save $1000, Tim Stone was the very next person Ms. Acciavatti called – for a second time.  (*Id*. at 103)   She reported to Mr. Stone, her boss, what she had learned to her from Defendant Bates, her subordinate.  (*Id*. at 103)

27.     Ms. Acciavatti continued to investigate the incident at the jail in conjunction with human resources, and her boss, Mr. Ridley.  (*Id*. at 141)

28.     When asked during her deposition why she terminated Nurse Bates, Ms. Acciavatti testified it was her "understanding that Michael Carter had diabetic ketoacidosis, that she [Bates] hadn't given him his Metformin, that she placed him back in general population without getting approval from Dr. Braco, and for that reason as well as her appearing to lack empathy was the reason for her termination."  (*Id*. at 113)

29.     Ms. Acciavatti further testified that she couldn't remember the exact date Defendant Bates had been terminated or if it had been weeks or months because she didn't have her notes (*Id*. at 111)

30.     Ms. Acciavatto also contradicted her Mr. Ridley's prior denial, under oath, of awareness of Defendant Bates' termination from DMH, when she testified Mr. Ridley was directly involved in the agreement to terminate Defendant Jo Bates.  (*Id*. at 141)  (Exh. G at  98-99)

***Plaintiff's 3rd Request for Production of Documents:***

31.     On December 31, 2018, three weeks after Ms. Acciavatti's deposition, Plaintiff emailed Defendant DMH's counsel Plaintiff's 3rd Request for Production of Documents (*See*

Plaintiff's 3rd Request for Production of Documents – Attached hereto as Exhibit I; and *See* Plaintiff's counsel email to defendant's Counsel regarding Plaintiff's 3rd Request – Attached hereto as Exhibit J)

32. Specifically, Plaintiff sought:

**DMH (3rd Request):**

1. Please identify and produce all documents, manuals, records, guidelines, booklets, emails, and/or notes relating to the protocol(s) drafted by Defendant Robert Braco, M.D. regarding evaluation and/or treatment of diabetic detainees held at Macon County Jail during 2013-2015, and maintained at Macon County Jail and Decatur Memorial Hospital as testified to by Debbie Acciavatti during her December 7, 2018 deposition.

2. Please identify and produce all documents, records, emails, text messages, and/or notes relating to the termination of Defendant Jo Bates's employment by Decatur Memorial Hospital.

33. Counsels for Defendants DMH and Braco repeatedly assured, in person and via phone, their clients were gathering the requested items, and they would be produced soon.

34. Defendant DMH was aware that the current deadline for discovery was set to expire March 31, 2019.

35. As the calendar approached March, Defendants DMH and Braco still had not produced the requested items, despite repeated requests by Plaintiff's counsel, and the approaching fact-discovery cut-off.

35. On March 6, 2019, Plaintiff's counsel again called Defendants' counsels and again requested Defendants' responses to Plaintiff's 3rd Request for Production of Documents.

37.     On March 7, 2019, Plaintiff tendered all counsel of record a Notice of Deposition for Defendant DMH's 30(b)(6) witness(es) and its employee, Mr. Stone.  (*See* Plaintiff's Notice of Deposition for DMH 30(b)(6) Witness(es) - Attached hereto as Exhibit K); and (*See* Plaintiff's Notice of Deposition for DMH 30(b)(6) Witness(es) - Attached hereto as Exhibit L)

38.     On March 12, 2019, and after still not receiving any of the requested items, or even an update, Plaintiff emailed and then phoned Defendants' counsels to confer regarding the outstanding discovery requests.  (*See* Plaintiff's counsel's 3/12/19 email to Defendant DMH's counsel regarding outstanding discovery – Attached hereto as Exhibit M)

39.     On March 13, 2019, and after Defendants' continued refusal to address Plaintiff's discovery requests, Plaintiff filed a Motion for a Hearing Concerning Discovery Dispute to address the issue with the Court directly, and to not be prejudiced with the looming discovery cut-off. (Dkt.  110)

40.     On March 21, 2019, and approximately two hours before the hearing on Plaintiff's motion concerning the discovery dispute, Defendants DMH and Braco filed a joint-motion seeking a protective order precluding Plaintiff from deposing Mr. Stone. (Dkt. 112)

41.     No mention made of their long overdue responses to Plaintiff's outstanding discovery requests, but Defendants found time to prepare a motion seeking to avoid one of its employees from having to provide relevant information under oath.

42.     At the conclusion of the March 21st discovery dispute hearing, and pursuant to Plaintiff's motion, the Court ordered Defendants DMH and Braco to respond to Plaintiff's 3rd Request for Production of Documents by or before March 28, 2019.

43.     The Court also noted during the hearing it would permit Plaintiff to conduct additional discovery and depositions related to Defendant's untimely disclosure.

9

44.     Immediately after the telephonic conference, Defendant DMH's counsel emailed objections to the production of any 30(b)(6) witnesses, as previously noticed by Plaintiff, and on issues obviously relevant to the crux of Plaintiff's claims against Defendants.  (*See* Defendant DMH's counsel email regarding objections to Plaintiff's 30(b)(6) Notice – Attached hereto as Exhibit N)

45.     Plaintiff's counsel responded promptly to Defendants' objections via email, and then also phoned Defendants' counsels to confer promptly.  Defendant DMH's counsels' main contention was that they had no one to produce, and they didn't intend to produce anyone. (*See* Plaintiff's counsel's email regarding DMH's 30 (b)(6) objections – Attached hereto as Exhibit O)

46.     Later the same day, on March 21, 2019, and due to Defendant DMH's refusal to commit to producing anyone as their 30(b)(6) corporative representative before the close of discovery, Plaintiff  filed another Motion for a Hearing Concerning Discovery Dispute to again address a discovery issue with the Court, and in order to not be prejudiced with the looming discovery cut-off.  (Dkt. #115)

47.     On March 26, 2019, the Court again ruled for Plaintiff and ordered Defendant DMH to identify and produce its 30(b)(6) witness for deposition.

48.     To the date of this writing, no Defendant DMH's 30(b)(6) witness still has been positively identified or confirmed.

49.     On March 28, 2019, the very last day allowed under the Court's March 21st order, Defendants' counsel emailed her clients' purported responses to Plaintiff's 3rd Request for Production of documents. (*See* Defendant DMH's counsel's email regarding Defendants' Responses to Plaintiff's 3rd Request for Production of Documents – Attached hereto as Exhibit P)

50.     Defendant Braco outright failed to comply with the Court's March 21st order, only an assurance from his counsel she's awaiting a signature page attesting he has nothing.  (*Id.*)

51.     Defendant DMH produced Defendant Bates' personnel file. (*Id.*)

52.     Defendant DMH's recent disclosure confirms Defendant Bates was terminated for behavior related to the incident involving Michael Carter, Sr. (*See* Defendant DMH documents relating to DMH Human Resources investigation into Defendant Bates job performance  – Attached hereto as Exhibit Q)

53.     Next, and quite shockingly, in a narrative portion of the DMH Human Resources investigation concerning whether she should be terminated, it's noted:

Defendant DMH 3/28/19 disclosure

**"August 26, 2015**

…they claim that the employee made several statements, in front of other Correctional Officers or investigators that were unprofessional.  Debbie relayed that **she told them "if you need anything, I'm going to the boat and will be drinking."  They felt this statement was not appropriate due to the fact that an inmate had died during her shift.**  They allege that she made the following statement during the course of the investigation **"this was Gods way of natural selection, weeding out the rif, raf**" in regards to the inmates death.**"**

---------

**They also had some concern regarding her clinical judgment during the incident and indicated that she had told several CO officers that she believed the inmate was faking the illness and just being**

11

**uncooperative.  Based on this direction, they approached the inmate as**
**combative and used additional force.**  I asked Debbie is she believed that
the employee's actions required reporting to the IDPF and said no, I don't
believe so."

  ----------

"Debbie was insistent on terminating the employee's employment at this
time.  I asked if she had spoken with John Ridley about the situation and did
(sic) agree with the plan moving forward.  She indicated yes, that she had
spoken with him after meeting with the jail and he was in agreement."

## <u>LEGAL STANDARD</u>

Rule 37 allows a court to sanction a party for discovery noncompliance caused by
"willfulness, bad faith or fault," while Rule 41(b) authorizes sanctions, upon a party's motion
based on a "clear record of delay or contumacious conduct."  *Brown v. Columbia Sussex Corp.*,
664 F.3d 182, 190 (7th Cir. 2011) (internal quotations omitted). Federal Rules of Civil Procedure
37 and 41(b).

In civil cases, the facts underlying a district court's decision to dismiss the suit or enter a
default judgment as a sanction under Rule 37 or the court's inherent authority need only be
established by a preponderance of the evidence. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772 (7th
Cir. 2016).  Rule 37(b)(2)(A)(v) authorizes a range of sanctions, including the dismissal of a suit,
for a party's failure to comply with the court's discovery orders; and Rule 37(a)(4) treats an
evasive and incomplete answer in discovery as equivalent to no answer, and thus a failure to
comply with court-ordered discovery.  *Id*.

A party may "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things." Federal Rules of Civil Procedure 26 (b)(1).  "Rule 37(b) sanctions provide the district court with an effective means of ensuring that litigants will timely comply with discovery orders." *Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 670 (7th Cir. 1996).

Further, "the district court has primary responsibility for selecting an appropriate sanction, and [the Seventh Circuit] will not reverse the district court's selection absent a clear abuse of discretion." *Melendez*, 79 F.3d at 671 (citation omitted).  (Rule 37(b)(2)(A) (v) and (vi) authorizes both the dismissal of the action and the entry of a default judgment against the offending plaintiff or defendant; and the court's inherent power to sanction misconduct is likewise symmetrical; *See Secrease v. Western & Southern Life Ins. Co*., 800 F.3d 397, 401 (7th Cir. 2015)

Sanctioning power conveyed by Rule 37 to extend to instances of a party hiding evidence.  *Negrete v. Nat'l R.R. Passenger Corp*., 547 F.3d 721, 723–24 (7th Cir. 2008).  Apart from the discovery rule, a court has the inherent authority to manage judicial proceedings and to regulate the conduct of those appearing before it, and pursuant to that authority may impose appropriate sanctions to penalize and discourage misconduct. *See Chambers v. NASCO, Inc*., 501 U.S. 32, 46–50, 111 S. Ct. 2123, 2134–36 (1991).

Fault, in contrast to willfulness or bad faith, does not require a showing of intent, but presumes that the sanctioned party was guilty of "extraordinarily poor judgment" or "gross negligence" rather than mere "mistake or carelessness." *Marrocco v. Gen. Motors Corp*., 966 F.2d 220, 224 (7th Cir. 1992); Long v. Steepro, 213 F.3d 983, 987 (7th Cir. 2000) ("[f]ault in this

context suggests objectively unreasonable behavior"); *see* also *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642–43 (7th Cir. 2011) (distinguishing degree of fault necessary to support dismissal or default from that necessary to support lesser sanctions).

## **ARGUMENT**

Plaintiff has alleged Mr. Carter, Sr. died in the care and custody of the Defendants named in her Amended Complaint.   It is essential to Plaintiff's prosecution of her claim that Defendants, who possess core factual information relating decedent's time in their custody and care.  Decedent is unable to share his own account, so Plaintiff is already at a disadvantage in fact gathering, and relies upon fair-brokers in the discovery process, and who adhere to the rules. A fair exchange of requested relevant information is not only essential to Plaintiff proving her case to a jury, but it is her right.

Defendants DMH and Braco were repeatedly asked if they had knowledge concerning the existence of the following:

1. any known statements relating to the care and treatment of Michael Carter, or the damages alleged

2. documents, manuals, records, guidelines, booklets, emails, and/or notes relating to the protocol(s) drafted by Defendant Robert Braco, M.D. regarding evaluation and/or treatment of diabetic detainees held at Macon County Jail during 2013-2015; and

3. all documents, records, emails, text messages, and/or notes relating to the termination of Defendant Jo Bates's employment by Decatur Memorial Hospital.

14

Defendant DMH's repeated refusal to comply with discovery, but most importantly Defendant DMH's withholding of critical evidence is inexcusable.  The vile comments attributed to Defendant Bates evidence her state of mind near the time Michael Carter, Sr. was under her care, and near the time he died.  Defendant Bates is described as saying,  **"[if] you need anything, I'm going to the boat and will be drinking."**  (Exh. Q)   Followed by evidence of her deliberate indifference, **"this was Gods way of natural selection, weeding out the rif, raf."** (*Id*.)   These comments are disgusting, and Defendant DMH knows it, which is they chose to conceal it for so long, and until the Court order the personnel file to be disclosed.

Additionally, it is troubling that Defendant DMH would participate in a Court-sponsored settlement-conference in Urbana, under the guise of good-faith, while withholding such a critical piece of evidence. Plaintiff made her requests for information long before talk of a settlement conference.  Furthermore, Defendant DMH allowed its counsel to sit silent during multiple depositions when it knew the requested items were germane to the topics being discussed.  Yet, Defendant DMH remained silent, as it hid valuable evidence and allowed Plaintiff to depose witness after witness.  It is obvious that the statements contained in the personnel file, alone, could allow the jury to infer deliberate indifference.   No other objective conclusion can be drawn here, except bad-faith.

Next, Defendant DMH has still failed to produce internal emails sent between its HR director and Ms. Acciavatti concerning their investigation into Defendant Bates' potential termination due to her involvement in Mr. Carter, Sr.'s death.  The email exchange is referenced in the narrative portion of its March 28th production.  (*Id*.)

Defendant DMH's consistent failure to comply is a flagrant violation of the Court's order and not in the spirit of good-faith discovery, and no reasoning has been  provided for the last-

second document dump.  Even if Defendants' disregard of Court orders does not evince willful

or intentional behavior, it certainly demonstrates a reckless disregard of their obligations to

comply with Court orders, and that justifies sanction. *See Marrocco v. Gen'l Motors Corp*., 966

F.2d 220, 224 (7th Cir. 1992) ("'Bad faith,' . . . is characterized by conduct which is either

intentional or in reckless disregard of a party's obligations to comply with a court order.").

 The only objective conclusion one can draw, as to Defendant DMH's failure to disclose

this information was intentional.   It was originally requested on January 5, 2018, more than a

full year ago.  Another narrow was made on December 31, 2018, almost four months ago.  And

not until the very last day provided for in the Court's recent order, and and only three days

before discovery was set to close, Defendant DMH produce.  Even if its withholding of this

damaging evidence was unintentional, it was grossly reckless, at best.  Either scenario

unacceptable, and warrants a proportionate sanction.

 The possible sanctions for failure to comply with a discovery order are listed in Rule 37

and include "directing that the matters embraced in the order or other designated facts be taken

as established for purposes of the action, as the prevailing party claims." Fed. R. Civ. P.

37(b)(2)(A)(i); see Fed. R. Civ. P. 37(d) (authorizing any of the sanctions listed in Rule

37(b)(2)(A)(i)–(vii) for failure to answer interrogatories).

 Plaintiff should have had this information more than a year ago.  Defendant DMH's late

discovery response enormously burdens Plaintiff, and places her in an untenable position.   First,

this issue could have been avoided altogether if Defendants, and Defendant DMH specifically,

would have simply followed the rules and not shown reckless disregard, at best, in their failure to

comply with discovery**. The shocking new evidence requires Plaintiff's counsel to re-depose

between nine to thirteen witnesses.**  In addition, there are at least two or more new witness

16

identified, who appear to have personal knowledge concerning key facts surrounding Defendants' Bates' termination and her involvement with Michael Carter around the time of his death.

This matter is currently set for trial on March 3, 2020, with fact-discovery set to close March 31, 2019.  While Plaintiff anticipated taking two to three more Defendant DMH-employee related depositions, and extending the fact and expert discovery deadlines, based upon the Court's March 21, 2019 hearing comments, Plaintiff did not anticipate the depth of information contained in Defendant DMH's untimely disclosure.

It's an impossible feat for Plaintiff to complete the necessary fact discovery now demanded, without the Court modifying the current trial date.  This is patently unfair to Plaintiff.  Defendants should not be unjustly enriched in their effort to dribble out the discovery clock, while evading disclosure of critical evidence it knows is crushing damaging to its entire defense theory.  Again, Defendant's actions have been grossly reckless, at best.

Plaintiff's counsel is a sole-practitioner, who lives and works in Chicago, Illinois.  Plaintiff's counsel has traveled to Decatur over the past year and deposed nearly twenty witnesses, party and non-party, both pursuant to notice and subpoena.   Each typical trip requires a three-hour train ride from Chicago to Springfield, and a 45-minute Uber ride to Defendants' counsels' law office in Decatur.  Despite Plaintiff's *Monell* claim, Defedant DMH has only voluntarily produced one non-witness depositions, John Ridley.  Defendant DMH has objected to every single other notice for witness deposition issued to it by Plaintiff.   (Dkt. 84 – 88, 122)

On March 29, 2019, the day after receiving Defendant DMH's late-disclosure, Plaintiff emailed Defendants' counsel asking for an explanation as to why this critical information was not turned over sooner.  (Please See Plaintiff's counsel's email to Defendant DMH's counsel

17

regarding late disclosure – Attached hereto as Exhibit S)   To the date of this writing, the final day of fact-discovery, there has been no explanation advanced.

Plaintiff requests the Court enter the following sanctions:

a. Deem it admitted and/or found:  Defendant DMH enforced an express healthcare policy, which was deliberately indifferent to the constitutionally guaranteed rights of those detained at Macon County Jail from July 13, 2015 until July 18, 2015, including Michael Carter, Sr.;

b. Deem it further admitted and/or found:   Plaintiff's injuries complained of in her Amended Complaint were caused by Defendant's express healthcare policy, which was deliberately indifferent to the constitutionally guaranteed rights of those detained at Macon County Jail from July 13, 2015 until July 18, 2015 including Michael Carter, Sr.;

c. Bar Defendants DMH and Braco, and any of their agents/employees and/or retained experts, from testifying regarding the existence of documents, manuals, records, guidelines, booklets, emails, and/or notes relating to any and all protocols and/or policies regarding the evaluation and/or treatment of diabetic detainees held at Macon County Jail during 2013-2015;

d. Bar Katherine Anderson from further attesting to discovery compliance in this matter;

e. Order Defendant DMH to submit all materials, in every form and regardless of an asserted privilege, for an *in camera* inspection by the Court;

f.  Order Defendant DMH to submit another attestation indicating it has conducted a thorough search responsive to Plaintiff's request, including all email, electronic and digital formats;

g.  Order DMH to pay for any and all attorney's fees, costs, expenses, travel, and lodging associated with any discovery and/or motions related to its late disclosure, including preparation of the herein motion.

<u>**CONCLUSION**</u>

No lesser sanction would be effective at addressing Defendants' flagrant and continuing disregard of their discovery obligations, the Court's order, and the enormous burden placed upon Plaintiff and her counsel.  Without explanation of the delay of more than a year of items asked for during discovery, no other objective conclusion can be made other than Defendant DMH intentionally withheld evidence because it was extremely damaging to its own pecuniary interests and reputation, or it was grossly reckless, at best.  This is highly improper, and the very reason Rule 37 exists.  Plaintiff has met her burden by a preponderance of evidence as to why Defendants should be sanctioned.

WHEREFORE, Plaintiff requests this Court enter an order of sanctions against the defendants for the reasons stated above, and to extend discovery to also allow Plaintiff to complete discovery arising from Defendant's late-disclosure, and for any other such relief the Court deems just.

<u>s/Rahsaan A. Gordon</u>
Attorney for Plaintiff

Rahsaan A. Gordon
**LAW OFFICES OF RAHSAAN A. GORDON**
333 West Wacker Drive, Suite 500
Chicago, Illinois 60606
(312) 422-9500
Atty. No. 42809

19

## CERTIFICATION OF WORD COUNT

Plaintiff's response memorandum complies with the type volume limitation of the Central District of Illinois. There are 5,121 words contained in the herein memorandum.  Plaintiff's counsel has relied upon the character count of the word processing system used to prepare the document.

s/Rahsaan A. Gordon
Attorney for Plaintiff

## CERTIFICATION OF CONFERRAL

The undersigned certifies that pursuant to Fed. R. Civ. P. 37 he has in good faith conferred or attempted to confer with counsels for the party failing to make disclosure or discovery in an effort to obtain it without court action, including phone conversations.

s/Rahsaan A. Gordon
Attorney for Plaintiff

## PROOF OF SERVICE

The undersigned certifies that the foregoing Motion for Hearing Concerning Discovery Disputes was filed on the 31st day of March 2019 through the ECF system with the United States District Court for the Central District of Illinois for delivery to registered participants for the litigation in which said document has been filed.

s/Rahsaan A. Gordon
Attorney for Plaintiff

Rahsaan A. Gordon
**LAW OFFICES OF RAHSAAN A. GORDON**
333 West Wacker Drive, Suite 500
Chicago, Illinois 60606
(312) 422-9500
Atty. No. 42809
rg@attorneygordon.com